### PENNSYLVANIA CRUSHER CO. et al. v. BETHLEHEM STEEL CO. et al.

#### No. 10465.

United States Court of Appeals Third Circuit.

Argued Nov. 15, 1951.

Decided Dec. 27, 1951.

446

W. B. Morton, Frank A. Bower, New York City (Harry S. Dunmire, Pittsburgh, Pa., on the brief), for appellants.

Harker H. Hittson, Columbus, Ohio (Jo. Baily Brown, Julian Miller, Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., on the brief), for appellees.

Before MARIS, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This is a patent infringement action. The Pennsylvania Crusher Company ("Pennsylvania") is assignee of Patent No. 2,149,571 (hereinafter caller the "Battey patent") and is licensee of Patent No. 2,155,151 issued to William H. Schacht. Pennsylvania has joined with Marguerite C. Schacht, administratrix of the estate of William H. Schacht, deceased, in bringing this suit against the Bethlehem Steel Company and The Jeffrey Manufacturing Company, alleging infringement by defendants of Claim 2 of the Schacht patent and Claims 4, 6, 9, and 10 of the Battey patent.[1]

In April 1939, defendant Jeffrey sold to defendant Bethlehem two 42″ x 82″ Type B

[1]. The complaint alleged infringement of other claims of both patents. These claims, however, were withdrawn by plaintiffs. The complaint also included allegations that Schacht Apparatus Patent No. 2,155,150 had been infringed, but this was not pressed.

swing hammermills, which were placed in operation in Bethlehem's Johnstown, Pennsylvania, plant by March 1940. The operation of these two hammermills by Bethlehem constitutes the basis of the charge that Bethlehem has infringed both patents. Jeffrey is charged with contributory infringement of both patents and is alleged to be a direct infringer of the Battey patent.

Holding the patents to be invalid and not infringed, the district court entered a judgment dismissing the complaint and awarding costs and reasonable attorneys' fees to defendants. This appeal followed.

The subject of both patents is the hammermill crusher. Hammermills have been used for many years to crush coal, ore, stone and like materials. A typical crusher of the hammermill type consists of a horizontal rotating shaft carrying several rows of hammers which are projected radially from the shaft and are mounted for swinging movement. The hammers rotate at a very high velocity. For example, the alleged infringing devices, the 'Jeffrey-Bethlehem crushers, normally operate at 735 R.P.M. The hammers are enclosed by a casing or housing, the upper half of which is lined with heavy iron plates, known as breaker plates. Spaced grate bars line the lower half of the casing. The material to be crushed enters through a feed opening in the upper part of the casing and drops by gravity, some of it falling directly into the paths of the revolving hammers, where it is at least partially crushed by the impact of the hammers and is then impelled against the breaker plate for further crushing. The crushed particle then falls into the path of another hammer to be impacted again. The material finally falls into the bottom of the casing, where it is crushed by the hammers against the grate bars through which the material eventually falls.

It is easily understandable even to the layman that more efficient crushing results when the particles are not given glancing blows but are squarely impacted. Every lad who has stood at home plate anxiously awaiting the pitcher's delivery realizes that a foul ball will not bolster his batting average. It is plaintiff's contention that Schacht made an original contribution to the art of crushing by teaching how to obtain a square impact. The Schacht patent, a method patent, teaches the necessity of so correlating the feed velocity of the particles with the velocity of the hammers and the spacing of the hammers that substantially each particle of the stream is carried fully into the path of an impact member. A sufficiently high velocity of the feed is obtained by simply harnessing the law of gravity; hence the name "High Drop," which plaintiff Pennsylvania affixes to its hammermills.[2]

The district judge found Claim 2 of the Schacht patent invalid on the grounds of anticipation by the prior art, vagueness, and insufficient description and disclosure.

We are in agreement with the findings of the trial judge. The opinion written by that court was a comprehensive one and an excellent one.[3] Indeed, there is really little that this court can add.

The standard of description to which the inventor must conform is clearly set out by statute. R.S. § 4888, 35

2. Claim 2 of the Schacht patent is as follows: "The method of impact crushing which includes, first, projecting by gravity, and along a generally defined path, a stream of the particles to be crushed; moving transversely through said path a succession of impact members, at such speed and momemtum as will cause adequate crushing impacts to the dropping particles of said stream; maintaining the velocity of the particles fed into the crushing zone formed by the intersection of the path of feed and the path of the impact members sufficiently high, in relation to the speed and spacing of the successive impact members, to carry substantially each particle of the stream fully into the path of the impact member which impacts it, whereby such particle is positioned to be squarely impacted by the impact face of such impact member, and thereafter withdrawing the broken particles from the crushing zone."

3. Pennsylvania Crusher et al. v. Bethlehem Steel Co., D.C.W.D.Pa., 1951, 95 F. Supp. 696.

U.S.C.A. § 33. The inventor is directed to describe his invention in "such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same * * *." In return for the grant of a patent monopoly, the statute thus exacts a consideration. Specifically defined claims perform a dual function: the public is given adequate notice as to the bounds beyond which it cannot safely trespass, and specific teaching enables others to use the invention successfully when the period of monopoly ends. Further, unless the inventor clearly distinguishes between the prior art and his original contribution, it is difficult for the court to determine whether novelty and invention are genuine. United Carbon Co. v. Binney Co., 1942, 317 U.S. 228, 232, 63 S.Ct. 165, 87 L.Ed. 232; General Electric Co. v. Wabash Corp., 1938, 304 U.S. 364, 368–369, 58 S.Ct. 899, 82 L.Ed. 1402.

To meet the statutory standard of description for a method or process patent, the claim must include all necessary occurrences in the process. See 2 Walker on Patents § 171 (1937 Ed.) We agree with the trial judge in his conclusion that the Schacht claim is defective in this respect. The larger a given particle, the farther it must fall in order for it to be squarely impacted. Thus, the size of the particles is crucial. But, as the trial court well observed, the Schacht claim makes no mention of the importance of the size range of the material. In order to use the Schacht method effectively, a screen analysis of the material is a prerequisite, for the size range of the particles must be determined and the relative frequency of the larger size particles ascertained. Schacht also is silent with respect to the significance of the length of the hammers.[4] The bare statement that the feed velocity must be sufficient to "carry substantially each particle of the stream fully into the

path of the impact member" is not an adequate description; it is merely descriptive of the result desired—i. e., full impact. See General Electric Co. v. Wabash Corp., supra.

The Schacht claim is so vague as to make it virtually impossible for those skilled in the art to know where the scope of the patent monopoly ends. Even were we to assume that the patent gives adequate treatment to the importance of the size range of the material, how does the hammermill operator know when he has attained substantial penetration? As the trial court so ably pointed out, a hammermill operator who was not operating in accordance with the Schacht method might on any given day suddenly find himself infringing the patent merely because he commenced using materials of a smaller size range.

Since we are dealing with a stream of particles, it is elementary that, regardless of the velocity of the material, some of the particles must be given glancing blows. What percentage of glancing blows does the Schacht claim contemplate? If the best penetration attainable will vary with the size range and distribution of the material and the length of the hammers, then these limitations should be set forth in the claim. Moreover, some of the descending particles are destined to strike the tops of the hammers. What percentage of these will eventually fall into the path of a hammer and be squarely impacted?[5] The patent offers no illumination as to this. Further, there is a space between each of the adjacent hammers in any one row. Since defendant's calculation reveals that in the Jeffrey-Bethlehem crusher 46% of the hammer cylinder is not traversed by hammers, a corresponding 46% of the particles are doomed to fall into these spaces, and thus not be impacted except possibly by side blows. Defendant's calculation, not contradicted by Pennsylvania, clearly shows that in the Jeffrey-Bethlehem hammermills only 42.5% of the particles are projected

4. See Note 62 of the opinion of the District Court, 95 F.Supp. at page 709.

5. Even should some of these particles later fall into the path of a hammer and be

squarely impacted, the Schacht method can hardly claim the credit, since this is in no way related to the height of the feed.

by gravity at such velocity as to be squarely impacted. If the "substantial penetration" in the Schacht patent is intended to mean substantial penetration only of those particles which fall into that part of the hammer cylinder traversed by hammers, then the Schacht claim should have been so narrowed.

The opinion of the trial court dealing with the anticipation of the Schacht patent by the prior art is thoroughly comprehensive and there is no need for us to elaborate on it. That court's findings of fact with respect to the Schacht patent are adequately supported by the record.

█ The Battey patent is an apparatus patent. The essential elements of the Battey machine are a feed inlet located centrally over the hammer system, a reversible rotor, and a crushing chamber having its opposite sides symmetrical with relation to a central longitudinal vertical plane.[6] Battey claimed to have discovered a valuable new technique. He taught that the useful life of the hammers and the grate bars could be greatly prolonged by frequently reversing the direction of rotation. To this discovery he gave the name "resharpening," and the Battey hammermill was designed to take advantage of this "resharpening" effect. The trial court found that claims 4, 6, 9, and 10 of the

Battey patent were invalid in view of the prior art and because of indefiniteness and insufficiency of description and disclosure. These findings, too, we think have adequate support in the record.

A study of the prior art as revealed in the record makes it abundantly clear that the claims of the Battey patent here involved were fully anticipated. Most noteworthy of mention is the 16" x 12" Type B Pulverizer manufactured by Jeffrey as early as 1909. These were reversible, symmetrical machines equipped with swing hammers having identical faces for impacting in either direction of rotation. The only significant difference between this machine and the Battey machine is that the Jeffrey 1909 had a vertical side feed rather than vertical central feed. To prevent some of the material from being thrown back into the feed opening, a liner was bolted to the hopper on top of the machine, thus covering a part of the opening. To be operated most efficiently in the opposite direction, it would have been necessary to move the liner to the opposite side of the opening.[7]

█ The trial judge found that the claimed "resharpening" would occur equally with the Jeffrey 1909 machine if it were reversed frequently, in accordance with Battey's teachings. Thus, even if we as-

6. Claim 6 of the Battey patent: "A reversible hammermill comprising a housing, a crushing chamber, a system of swinging hammers in the chamber maintained in operative position by centrifugal force and rotated as a unit, a feed inlet located centrally over the hammer system, a separate breaker plate at one side of the inlet mounted in the housing and spaced from the hammer path by a distance greater than the diameter of the largest piece of material to be crushed and positioned to intercept material from the inlet impacted by the hammers when rotated in one direction, a separate breaker plate at the other side of the inlet mounted in the housing, similarly spaced from the hammer path and positioned to intercept material from the inlet impacted by the hammers when rotated in the other direction, and a screen located below the hammer system having edges extending transversely to the direction of travel of the hammers and posi-

tioned to support oversize."
Claims 4 and 9 are substantially similar.
Claim 10 reads as follows: "A reversible hammermill as set forth in claim 9 having a primary crushing zone in which the separate symmetrical breaker plates are mounted and, a secondary crushing zone having crushing screens provided with discharge opening edges generally parallel to said axis of the hammer system and located symmetrically adjacent the lower portion of the hammer path in position to provide abrasive action between the hammers, bars and interposed material."

7. The trial court found that centrally located top feed inlets for symmetrically constructed crushers were well known in the art of hammermill crushing and in analogous arts, and that no novelty or invention was required in substituting a central top feed for the type of feed in the Jeffrey 1909 machine.

sume that the so-called "resharpening" effect was unknown in the prior art and that its discovery by Battey rises to the dignity of invention, nevertheless Battey's only discovery was a new manner of using an old machine. Such a discovery is clearly not patentable. Mathews Conveyor Co. v. Palmer-Bee Co., 6 Cir., 1943, 135 F.2d 73, 89.

Even if we were to accept the thesis urged upon us by Pennsylvania that the Battey machine is a new combination of old elements, we do not think it can withstand the strict test set forth by the Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. That decision directs us to "scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements."

The district court found that resharpening occurs only under certain conditions: the hammers must be of a special alloy steel and the material treated must be a hard substance like limestone. The failure of the Battey claims to include these limitations and the lack of any specific instruction as to the required frequency of reversal[8] would seem to render the patent fatally defective. Pennsylvania contends, however, that the district court was confused as to the meaning of resharpening. It argues that the resharpening above described is not that claimed by Battey, but merely represents additional resharpening which occurs in special instances, an effect unknown to Battey. If there was any confusion as to the meaning of the term, we think the blame must be shouldered by plaintiff's expert, for he admitted that he had spoken about several kinds of resharpening and that he had mixed them up. The expert in effect admitted that resharpening was really a misnomer in that the original contours of the hammers were never restored; the only effect of frequent

reversals was to round off each end of the hammer at a uniform rate. One theory of resharpening was explained as follows: By attaining uniform wear of both ends of the hammer, the cage can be readily adjusted to compensate for the decreasing length of the hammer. Thus the same clearance is always retained between the end of the hammer and the cage, resulting in efficient secondary crushing. On the other hand, plaintiff's expert pointed out that if the direction of rotation is not reversed frequently, a heel develops on the trailing edge of the hammer, which prevents the adjustment of the cage for proper clearance with the leading edge of the hammer. To further emphasize his interpretation of resharpening, plaintiff's expert resorted to a homely analogy. If the nut on a pair of scissors is loose, the scissors will not cut well. Tighten the nut, and the scissors cut well. This is the type of resharpening which plaintiff's expert claimed for the Battey patent.

If this be the resharpening which the Battey patent claims, we think it falls far short of the test set forth in the A. & P. case. Such results can hardly be termed "unusual or surprising." Battey's so-called resharpening effect is at most the product of mere mechanical skill, and thus fails to attain the level of inventive genius which Article I, § 8 of the Constitution authorizes Congress to reward. See Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58.

The district court awarded the defendants reasonable attorneys' fees. R.S. § 4921 authorizes the trial court in its discretion to award reasonable attorneys' fees to the prevailing party upon the entry of judgment in any patent case. See 35 U.S.C.A. § 70. The legislative history of the provision, however, makes it clear that even though the trial judge is given discretion, there was no intention that attorneys' fees be awarded in patent cases as a matter of

---

8. There is no mention whatsoever in the Battey patent of how frequently one should reverse the direction of rotation in order to take advantage of the claimed resharpening. This in itself would render the validity of the patent open to grave doubt under R.S. § 4888, 35 U.S. C.A. § 33. See earlier discussion of this section in connection with the Schacht patent.

course. The provision was designed to prevent a gross injustice to an alleged infringer.[9] Decisions construing this provision have interpreted it in harmony with the above expression of legislative intent. It has been indicated that fraud practiced on the Patent Office or vexatious or unjustified litigation are adequate justification for awarding attorneys' fees. See Park-In Theatres v. Perkins, 9 Cir., 1951, 190 F.2d 137; Dubil v. Rayford Camp & Co., 9 Cir., 1950, 184 F.2d 899, 902–903.

The district court made no finding setting forth the reason for the award. Several other Circuits have held that unless the basis of the award is clearly stated by the trial court, the award will be set aside. Laufenberg, Inc. v. Goldblatt Bros., 7 Cir., 1951, 187 F.2d 823, 825; Dubil v. Rayford Camp & Co., supra. We think this rule is a sound one and should be applied here.

. The judgment of the district court will be affirmed insofar as it dismisses the complaint and awards defendants their taxable costs; the judgment will be reversed insofar as it allows counsel fees to defendants.

9. See Sen.Rep.No.1503, 79th Cong., 2d Sess., 1946 U.S.Code Cong.Serv. pp. 1386, 1387.