**POPEIL BROTHERS, INC., Plaintiff,**

v.

**SCHICK ELECTRIC, INC., et al.,
Defendants.**

**Nos. 70 C 295, 71 C 591, 71 C 979 and
71 C 1352.**

United States District Court,
N. D. Illinois, E. D.

Nov. 14, 1972.

242

Dugald S. McDougall, Theodore R. Scott and Melvin M. Goldenberg of McDougall, Hirsh & Scott, and George B. Christensen, Chicago, Ill., for plaintiff.

I. Irving Silverman, Myron C. Cass and Herbert Singer, George N. Hibben, John Dewey, Walther E. Wyss, George R. Clark, Neil M. Rose, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BAUER, District Judge.

*The Parties and Jurisdiction*

1. Plaintiff, Popeil Brothers, Inc., is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in the City of Chicago, State of Illinois.

2. Defendant, Schick Electric, Inc., is a corporation organized and existing under the laws of the State of Delaware and has a place of business in the City of Chicago, State of Illinois.

3. Defendant, Schick Service, Inc., is a corporation organized and existing under the laws of the State of Delaware and has a place of business in the City of Chicago, State of Illinois.

4. Defendant, Sperry Rand Corporation, is a corporation organized and existing under the laws of the State of Delaware and has a place of business in the City of Chicago, State of Illinois.

5. Defendant, Sunbeam Corporation, is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in the City of Chicago, State of Illinois.

6. Defendant, Northern Electric Company, is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in the City of Chicago, State of Illinois.

7. Defendant, Aldens, Inc., is a corporation organized and existing under the laws of the State of Illinois and has its principal place of business in the City of Chicago, State of Illinois.

8. On February 10, 1970 Plaintiff, Popeil Brothers, Inc. filed Civil Action No. 70 C 295 against Schick Electric, Inc. and Schick Service, Inc.

9. On March 9, 1971 Plaintiff, Popeil Brothers, Inc. filed Civil Action No. 71 C 591 against Sperry Rand Corporation.

10. On April 23, 1971 Plaintiff, Popeil Brothers, Inc. filed Civil Action No. 71 C 979 against Sunbeam Corporation and Northern Electric Company.

11. On June 4, 1971 Plaintiff, Popeil Brothers, Inc. filed Civil Action No. 71 C 1352 against Aldens, Inc.

12. Civil Actions Nos. 70 C 295, 71 C 591, 71 C 979, and 71 C 1352 each are patent infringement actions which were consolidated for trial inasmuch as each involved the issues of (1) validity, (2) infringement, and (3) enforceability of Popeil patent No. 3,565,083 granted February 23, 1971. The Complaints charged contributory infringement as well as inducement of infringement, but Plaintiff has withdrawn its charge of contributory infringement (Plaintiff's Brief, pp. 3 and 23–24).

*Patent Grant, Ownership, and Right to Sue*

13. On February 23, 1971 United States Letters Patent No. 3,565,083 issued in the name of Samuel J. Popeil for "Method for Setting Hair" on an application filed July 28, 1969 under Serial No. 850,308, which in turn was a continuation of an earlier application Serial No. 551,320 filed May 19, 1966, now abandoned. Thus, Popeil is entitled to an effective filing date of May 19, 1966.

14. The entire right, title and interest in and to Popeil United States Letters Patent No. 3,565,083, including the right to bring suit for infringement of said patent, has been assigned to Plaintiff.

*Acts of Defendants*

15. Subsequent to February 23, 1971 and prior to March 19, 1971, Schick Electric, Inc. manufactured and sold, and Schick Service, Inc, sold, a hair curling unit designated as Lady Schick Steam Hair Curler with Beautifying Mist, Model No. 70 (PX 7), and each such unit was accompanied by instruction book No. 10903 (PX 7A).

16. Subsequent to February 23, 1971 and prior to March 9, 1971, the Remington Electric Shaver Division of Sperry Rand Corporation manufactured and sold a steam hair curling unit designated as Lady Remington Steam Rollers, Model HC–5 (PX 6), and each such unit was accompanied by instruction book No. 12776 (PX 6A).

17. Subsequent to February 23, 1971 and prior to April 23, 1971, Sunbeam Corporation manufactured and sold a steam hair curling unit designated as Lady Sunbeam Quick-Mist Hair Curler, Model No. HC 200 (PX 4), and each such unit was accompanied by instruction Book No. 368–3002970–F (PX 4A).

18. Subsequent to February 23, 1971 and prior to April 23, 1971, Northern Electric Company sold (a) a steam hair curling unit designated as Mist "20" Steam Hairsetter, Model No. 1526 (PX 2), and each such unit was accompanied by instruction book No. 62823–2 (PX 2A) and (b) a steam hair curling unit designated as Penncrest Deluxe Steam Mist Hairsetter, Model 1520 (PX 3), and each such unit was accompanied by instruction book No. 62834 (PX 3A).

19. Subsequent to February 23, 1971 and prior to June 4, 1971, Aldens, Inc. sold a steam hair curling unit manufactured by the Songrand Corporation, designated as Style Mist 20 (PX 5), and each such unit was accompanied by in-

struction book No. PN 0902–165 (PX 5A).

### The Patent in Suit

20. The patent in suit discloses both a method and an apparatus for setting hair wherein cylindrical rollers or curler of plastic or metal are heated to the temperature of boiling water either in a steamer or in a pot of boiling water. Upon removal of a curler from either the steamer or the pot of boiling water, a strand of hair is wrapped around the moist exterior of the curler while the curler temperature is in the range of 150°F. to 190°F., a wire clip is applied to hold the hair on the curler, and the curler is kept in the hair for at least two minutes to set the curl. Apparatus for heating the curlers in a steamer is disclosed in Figures 13 to 16 of the Popeil patent while apparatus for heating the curlers by boiling in a pot of water is disclosed in Figure 17. The patent in suit repeatedly refers to the alternative heating means as follows:

· (a) "heating, by steaming or boiling" (Column 1, lines 5–6),

(b) "steaming or boiling curler rolls" (Column 1, line 43),

(c) "steaming or boiling in water" (Column 1, lines 52–53),

(d) "removal from the steam or boiling water" (Column 4, line 67),

(e) "after having been removed from the steam chest 40 or boiling water" (Column 5, lines 43–44), and

(f) "the method of the invention requires steaming or boiling the curlers" (Column 6, lines 21–22).

The patent suit contains no claim to the apparatus *per se* but Plaintiff owns another patent No. 3,614,381 (DX 156), issued October 19, 1971, having an identical disclosure to the patent in suit. The inventor of both patents testified that patent No. 3,614,381 shows the preferred apparatus for practicing the method of the patent in suit. Plaintiff has not charged any of the Defendants with infringement of patent No. 3,614,381.

### May 19, 1966 is the Earliest Date to Which Popeil is Entitled

21. For the purpose of determining the date thereof, an invention is deemed to consist of two acts, namely, conception and reduction to practice. An invention may be reduced to practice by actually embodying the invention of the patent into practical form as by building a working model or by actually practicing the process if the invention is directed to a method or process. This is technically termed an "actual" reduction to practice. The only other way to reduce an invention to practice is to file a patent application thereon, which filing is considered to be a "constructive" reduction to practice. An invention is not completed until there has been either an actual or a constructive reduction to practice.

22. The burden of carrying a date of invention back of the filing date of a patent application is heavy and the evidence claiming to establish an earlier date must be so clear and unequivocal as to leave no reasonable doubt. McIlvaine Patent Corporation v. Walgreen Co., et al., 138 F.2d 177, 179 (7th Cir. 1943). An inventor's testimony must be corroborated. Howe v. General Motors Corporation, 252 F.Supp. 924, 936 (N.D.Ill. 1966). There is no corroborated evidence that Popeil conceived the alleged invention of the patent in suit prior to its effective filing date of May 19, 1966, and there cannot be a reduction to practice until there is a conception. Nor is there any corroborated evidence that Popeil ever actually reduced to practice the patented method before May 19, 1966, the effective filing date of Popeil patent No. 3,565,083, and the Court therefore finds as a fact that Popeil is entitled to no date prior to May 19, 1966.

### The Prosecution of the Patent in Suit

23. Plaintiff's original application (Serial No. 551,320)˙ for the patent in suit was filed on May 19, 1966 and contained a broad claim to a method of set-

ting hair using a cylindrical curler heated "in an aqueous environment to approximately the temperature of boiling water" (DX 141, p. 14). This claim and several others slightly narrower in scope were successively rejected by the Examiner for obviousness in view of the disclosures in U.S. patent No. 3,228,403 to Pasternack and No. 3,103,934 to Sabourin. Both prior art patents disclose roll-type curlers heated in a pot of boiling water and rolled into the hair after being removed from the boiling water. The Plaintiff argued in the Patent Office that the Pasternack and Sabourin patents disclosed only the use of hot *dry* rollers rather than hot *moist* rollers as in Plaintiff's invention. After a final rejection of its claims, Plaintiff filed a response contending that "the best prior art emphasizes applying heated rollers dry rather than insisting they be applied in a moist condition" (DX 141, p. 92). Although it filed a notice of appeal and an appeal brief, Plaintiff declined to perfect the appeal and abandoned the application Serial No. 551,320 in favor of a continuation application.

Plaintiff's continuation application, Serial No. 850,308, was filed on July 28, 1969. This application presented a method claim including the steps of "preheating the cylindrical curler in a steam chamber out of contact with any boiling water therein, "removing the heated curlers from the steam chamber after its exterior has attained its maximum effective moisture content of retained distilled water, and promptly wrapping a strand of hair about the curler in a tight engagement thereby entrapping the distilled water retained on the curler" (DX 141, p. 125). This claim was rejected on the basis of the Sabourin patent and MacDonald U.S. patent No. 1,504,567 relating to a steam hair waving apparatus. Plaintiff subsequently cancelled all claims and substituted the method claim that eventually became the claim of the patent in suit. The application was again rejected on October 9, 1970, solely on the MacDonald reference. Plaintiff appealed but the Examiner withdrew the rejection following a telephone interview with Plaintiff's attorney and permitted the application to issue with the claim now in suit.

24. During the prosecution of Popeil patent No. 3,565,083 in the United States Patent Office, the Examiner was never told that the prior art showed what Plaintiff now concedes it shows, namely heating curlers in a pot of boiling water and then rolling them into the hair after removal from the boiling water (Plaintiff's Brief, p. 5, DX 141). The Patent Office granted the patent in suit only after the Plaintiff had convinced the Patent Office Examiner that the Pasternack and Sabourin patents were not effective as references because the curlers they disclosed were dry when placed in the hair.

25. Plaintiff, in order to obtain a patent, limited the claim of the patent in suit by inserting, *inter alia,* the limitations that the curler be placed in the steam chamber "out of contact with any boiling fluid therein", that it be removed "only after it has attained an elevated temperature substantially of boiling water" and only after its exterior has attained its "maximum effective moisture content", that this maximum effective moisture content be transferred to the hair and that the curler be placed in the hair while within the temperature range of 150°F. to 190°F.

26. The Patent Office, in allowing the Popeil patent No. 3,565,083, apparently never considered such prior art as U.S. Churchill patent No. 1,809,510 (DX 142, Tab B), Canadian Churchill patent No. 295,443 (DX 142, Tab J), the Japanese instruction book (DX 1; DX 142, Tab C), nor the Japanese advertising pamphlet (DX 2; DX 142, Tab P), relied upon by the Defendants and each of such items of prior art is more pertinent to the subject matter claimed in the patent in suit than the prior art cited by or to the Patent Office during the prosecution of the patent in suit.

*Prior Art Methods of Curling Hair*

27. The major phenomena in curling hair are softening the hair to make it pliable, putting it in the desired shape, and then cooling and/or drying it to restore it to its unsoftened condition while remaining in the desired shape. (Tr. 262). Hair can be softened or made pliable by either water or heat or a combination of both (Tr. 262). There is no significance to a temperature of 212°F. for curling hair since a good curl can be attained at either higher or lower temperatures (Tr. 268–269). The moisture content necessary to make a good curl is between .0001 and .001 of a gram, and increasing the moisture beyond that range would not be beneficial since it would merely require more time or more heat to drive off the moisture (Tr. 269).

28. One prior art home hair curling technique involves moistening the hair and then rolling unheated rollers or curlers into the hair and retaining them with suitable clips. After the hair has dried, either at room temperature with the passage of time, or by applying heat with a hair dryer, the rollers are removed (DX 142, Tab D, paragraph 1).

29. Another prior art home hair curling technique is that of heating plastic rollers or curlers in a dry atmosphere and putting them into the hair dry, relying on heat alone to soften the hair. This is exemplified by the Carmen hair curlers (Plaintiff's Brief, pp. 5–6). Such curlers are in extensive use, and at least some of Defendants, if not all, sell this type of curler as well as the type which Plaintiff alleges when used infringes the single method claim of Popeil patent No. 3,565,083 (DX 153).

30. Plaintiff agrees that still another prior art technique for home curling involves heating curlers in a pot of boiling water and then rolling them into the hair after removing them from the boiling water (Plaintiff's Brief, p. 5). This is one of the two alternative methods disclosed in Popeil patent No. 3,565,083 (PX 1). A roll-type curler heated in a pot of boiling water will attain the temperature of boiling water as its maximum temperature, and Plaintiff admits that the amount of moisture on such curler when it is removed from the boiling water is similar to the moisture on the curler when the same hair curler is heated with steam in a steam chest (Tr. 151–152).

31. The use, in home curling techniques, of heat alone (supplied by the hair curler itself), moisture alone, and a combination of both heat and moisture supplied by the hair curler itself was well known before May 19, 1966, and the Court finds as a fact that these techniques are all prior art to Popeil patent No. 3,565,083.

32. Plaintiff admits that it was known in the United States prior to April 18, 1966 to perform the following steps in a hair curling operation:

(a) removing a heated cylindrical curler from the heating means after the curler has been heated;

(b) wrapping a strand of hair around the exterior surface of the heated curler which curler will remain hot for 8–10 minutes;

(c) securing the wrapped hair in place by means of a clip to form a curl;

(d) keeping the curler in the hair with the outer portion of the curler exposed to atmosphere for two minutes;

(e) removing the curler from the hair (Tr. 139–140; (DX 150).

33. All materials from which hair curlers might be constructed will transfer some moisture and some heat to a lock of hair when used as a curler, whether such curler is heated in a pan of boiling water or in a steam atmosphere (Tr. 143; DX 150), and hair curlers, whether heated in a boiling water bath or in an atmosphere of steam, will have a certain amount of moisture adhering to the exterior surface thereof immediately upon removal from said bath or atmosphere (Tr. 143; DX 150).

34. Plaintiff admits that a hair curler, whether heated in a boiling water bath or in an atmosphere of steam, will have a certain amount of moisture adhering to the exterior surface thereof immediately upon removal from said bath or atmosphere (Tr. 143; DX 150), and the Court finds as a fact that a curler removed from a pot of boiling water and rolled into a user's hair will supply heat and moisture to the hair.

35. Plaintiff admits that each of the prior art, disclosures of (1) Sabourin patent No. 3,103,943 (DX 142, Tab F), (2) Pasternack patent No. 3,228,403 (DX 152, Tab D), and the *France Soir* publication (DX 142, Tab Q) discloses heating roll-type curlers in boiling water before rolling them into the user's hair (Plaintiff's Brief, p. 5), and that the Pasternack patent specifically discloses a hair curler which when heated in boiling water to the temperature of boiling water (212°F.) will remain at a temperature within the range of 150°F. to 190°F. (specifically the range of 158°F. to 168.8°F.) for an extended period of time well in excess of five minutes (DX 142, Tab D).

### The Single Claim in Suit

36. The sole claim (claim 1) of the patent in suit is directed to a method of setting hair which consists essentially of the steps of heating a curler having moisture and temperature retaining characteristics in a steamer out of contact with any boiling fluid, keeping the curler in the steamer until heated and moisture is deposited thereon, removing the curler from the steam chamber only after it has attained a temperature substantially that of boiling water and has attained its maximum effective moisture content, wrapping a strand of hair around the moist exterior surface of the curler while the curler is within the temperature range of 150° F. to 190° F., securing the wrapped hair in place to form a curl, and keeping the curler in the hair with the outer portion of the curl exposed to the outside atmosphere for at least two minutes until the hair is set and the moisture dissipated by evaporation.

37. Popeil patent No. 3,565,083 shows the prior art method of heating hair curlers in boiling water and placing them in a user's hair while in a predetermined temperature range as an alternative to a method where the curlers are heated in an atmosphere of steam instead of in boiling water, and the Court finds as a fact that the only difference between the method claim of Popeil patent No. 3,565,083 and the admittedly prior art methods set forth in Findings 30 to 35 resides solely in heating the rollers in an atmosphere of steam instead of in boiling water.

### Scope and Content of Prior Art

38. Defendants gave notice under 35 U.S.C. § 282 of the prior art they would rely upon at the trial. At the trial, Defendants relied primarily upon two Japanese publications (DX 1, DX 2), one French publication (DX 142, Tab B), United States patent Nos. 1,809,510—Churchill (DX 14, Tab B); 3,103,934—Sabourin (DX 142, Tab F); 3,228,403—Pasternack (DX 142, Tab D); and the Canadian Churchill patent No. 295,443 (DX 142, Tab J).

39. The admittedly printed Japanese instruction book (DX 1) and the admittedly printed Japanese advertising pamphlet (DX 2) relate on their face to a device designated as the Matsushita Model EH–801 Hot Curler with Steamer. They each disclose a hair curling device comprising a plurality of rollers or curlers filled with a substance acting as a heat retainer, an electric steamer unit having a shallow heated pan with a removable cover, a mat for supporting the curlers horizontally in the steamer pan, and a measuring cup for introducing a small amount of water into the heated pan of the steamer. These documents also each teach how to operate and use the hair curling device. The evidence is uncontroverted that over five hundred of the instruction books (DX 1) and many

thousands of the advertising pamphlets (DX 2) were shown and distributed without restriction by Matsushita Electric Works Ltd. to numerous members of the public in Japan, including independent distributors, dealers, retailers, ultimate purchasers, and others prior to April 19, 1966. The record establishes and the Court finds as a fact that the Japanese documents each disclose the method steps of the patent in suit.

40. The Churchill patents, U.S. No. 1,809,510 and Canadian No. 295,443, like the patent in suit, each disclose the concept of heating one or more hair curling irons with steam *or* hot water as alternative heating means. While the drawing of these patents illustrates the alternative of heating the curling irons in boiling water, the other alternative of utilizing a steam environment for heating the curling irons is clearly taught. In fact, this alternative is actually claimed in claim 1 of Churchill's Canadian patent.

41. Defendants' witness Flowers built a model (DX 145) of the steam heated alternative disclosed in the Churchill patents and demonstrated it during the trial, utilizing both a conventional curling iron and one of the Carmen prior art plastic curlers (DX 53A). The demonstration established that both curlers, upon being heated in the steam chamber of the Churchill model, possessed moisture and temperature retaining characteristics, retained a temperature in the range of 150° F. to 190° F. for at least two minutes after removal from the steam chamber, and produced an excellent curl in human hair after such removal when at the temperature of boiling water. These demonstrations at the trial clearly establish and the Court finds as a fact that the Churchill patents teach each and every step of the method claim of the patent in suit.

42. Pasternack United States patent No. 3,228,403 and Sabourin United States patent No. 3,103,934 both disclose cylindrical plastic hair curlers filled with a heat retaining substance. The Pasternack curler is formed with a plurality of teeth or spines on its surface and is equipped with a metal hair retaining clip. Both curlers are adapted to be heated in a pot of boiling water and rolled into the hair to form curls. The *France Soir* publication describes a Sabourin type curler heated in boiling water. The publication instructs the user to shake the curler upon removal from the boiling water to get rid of the drops of water retained thereon. Plaintiff now admits that both of these patents as well as the French publication describe curlers heated in boiling water and being in a hot moist condition when placed in the hair, just as in the alternative method described in the patent in suit.

*Comparison of Prior Art and the Claim in Issue*

43. The patent in suit recites a number of purported advantages relied upon by Plaintiff to distinguish the claimed method over the cited prior art. Dry curling equipment is said to have "the tendency . . . to split or fray the hair ends" (Col. 1, lines 15–18). It is said that an advantage of the patentee's invention "stems from the moist drying of the hair which reduces the tendency to split ends of the hair, rather than promoting the same as does hot dry curling" (Col. 1, lines 56–59). Criticality is asserted for the curler to "retain a temperature in the range of 190°F. to 150°F. for 2 minutes" (Col. 3, lines 56–58). The patentee's rollers are said to have the property of "maximum effective moisture content" when taken from the steam chest" (Abstract, lines 1–3; Tr. 587). These purported advantages and attributes of Plaintiff's patented method are, however, at variance with basic facts in the art of curling hair. The record establishes that there is no criticality to the temperature range used for a curler, short of an excessive temperature of several hundred degrees, which would melt or burn the hair (Tr. 268, 269). The only difference in curling action between a dry heated curler and a

wet or steam heated curler is that the dry curler relies on moisture already in the hair whereas the wet curler uses added moisture which is more than is necessary. Both require the moisture to be evaporated from the hair in order to set the curl (Tr. 265, 266). There is also no difference between using a dry heated curler and a wet or steam heated curler with regard to splitting the hair ends. The record shows that split ends result from loss of natural oils due to washing or shampooing, and not from evaporation at the relatively low temperatures used in commercial hair curlers, whether wet or dry (Tr. 266, 267). The Court finds as a fact that plaintiff's alleged advantages are without factual foundation.

44. Plaintiff contends that the prior art does not teach the heating of curlers with steam out of contact with boiling water. It is clear, however, that this concept is taught in the Japanese prior publication (DX 1, DX 2) and the Churchill patents (DX 142, Tabs B and J). The Court finds as a fact that there are no differences between the method defined in the single claim of the patent in suit and either the Churchill patents or the Japanese documents, particularly if the claim is construed so as to cover the method by following any of the Defendants' instruction books. The Japanese documents do not specify the temperature of the curlers when used, but the instruction books of the Defendants likewise do not refer to or mention any temperature range. Therefore, to the extent that these instruction books are alleged to induce the ultimate user of the hair curlers to infringe the patent in suit, the Japanese publications anticipate the method claimed in the patent.

45. The relationship between the claim of the patent in suit and the Japanese publications is accurately and correctly shown in Defendants' Exhibit 148.

46. The relationship between the claim of the patent in suit and the Churchill patents is accurately and correctly shown in Defendants' Exhibit 149.

*The Level of Skill in the Art*

47. The uncontradicted record evidence establishes that the level of skill of the person having ordinary skill in the art of designing hair curling devices is that of one having an engineering degree and three or four years of working under the supervision of others (Tr. 207–209, 234–235).

*Secondary Factors*

48. The record is devoid of probative evidence of Plaintiff's commercial success of its hair curling method covered by the claim in suit. Plaintiff's sales statistics on its hair curlers do not reflect commercial success of its method, particularly when considered in light of the unusually large advertising expenditures of Plaintiff's distributors (Tr. 547, 543–544, 33).

49. The record contains no evidence of a long felt want for Plaintiff's patented method, nor any evidence of meaningful failures by others to develop such a method.

50. The record shows no recognition of the validity of the patent in suit by the trade through the taking of licenses and/or the payment of royalties.

51. Commercial success, solution to long felt want and failures of others, even if such factors existed, cannot tip the scales toward patentability, where as here the subject matter of the claim is clearly evident from the prior art. T. P. Laboratories, Inc. v. Huge, 371 F.2d 231 (7th Cir. 1966).

*Anticipation*

52. The record is clear, and the Court finds as a fact, that the steps of the method claim in suit are anticipated in all material respects by each of the Japanese prior publications (DX 1, DX 2, DX 148; Tr. 336–339, 451–455) and also by each of Churchill U. S. patent No. 1,809,510 and Churchill Canadian patent No. 295,443 (DX 142, Tabs D and J, DX 149; Tr. 299–301, 373–382, 438–439).

## Obviousness

53. The record establishes by uncontroverted evidence that the choice of parameters in designing a hair curling unit utilizing either steam heated curlers or dry heated curlers is a matter of ordinary engineering judgment and selection (Tr. 269).

54. The record is clear, and the Court finds, that any differences between the subject matter of the method claim in suit and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention thereof was made to a person having ordinary skill in the pertinent art (DX 146, DX 148, DX 149).

55. The record establishes, and the Court finds, that the steps of the method claim in suit are met in all material respects by hair curling devices independently developed prior to or substantially contemporaneously with the alleged invention. These independently developed devices are the Matsushita Model EH–801 Hot Curler with Steamer disclosed in Defendant's Exhibits 1 and 2 and the steam heater developed by Hankscraft for QHS hair curlers (DX 154D; Tr. 187, 195, 199, 201).

## Alleged Infringement

56. Plaintiff offered *ex parte* tests in an apparent attempt to show that, by following the Defendants' instruction books, operation of the respective devices would infringe the method claim in suit. The Court finds this evidence entitled to no weight because the tests were made *ex parte*, and moreover, the record shows that Plaintiff's expert, Dr. Dix, who conducted the tests, could not remember whether the Defendants' instructions were followed (Tr. 95), and because specific tests were arbitrarily selected or excluded in the results, variables were introduced as to time and temperature measurement (Tr. 98, 215, 250–251), and the test subjects were coached by Dr. Dix or his wife (Tr. 42, 50, 93, 101–102, 106–107).

57. Plaintiff has failed to prove its charge that Defendants actively induced infringement of the method patent in suit by selling devices with instructions for their use. The record establishes, and the Court finds, that the claim in suit contains specific limitations which preclude it from being read on any of the methods resulting from following the instructions accompanying Defendants' hair curling devices.

58. Plaintiff's expert, Dr. Dix, performed a test in open court to rebut certain testimony by Defendants' expert, Mr. Fishleigh, that the Lady Remington hair curler (PX 6) when used in accordance with its operating instructions (PX 6A) does not infringe the method claim in suit for the further reason that its rollers, when in the steam chamber, are not "out of contact with any boiling fluid therein" (Tr. 516, 520). The Court finds that the demonstration, and the subsequent testimony of Dr. Dix, establish the correctness of Mr. Fishleigh's testimony (Tr. 900–906).

## Misuse

59. Plaintiff, as set forth in Finding 20, is also the owner of United States Letters Patent No. 3,614,381, having a disclosure identical to that of the patent in suit, but with claims directed to a hair curling apparatus. Plaintiff has declined to assert its apparatus patent against the Defendants, choosing instead to use the method patent to suppress competition by the Defendants in the sale of hair curling appliances. After the trial of the instant case, Plaintiff disclaimed a portion of the term of patent No. 3,614,381 causing it to expire on February 3, 1987, more than a year before the expiration of the method patent in suit which expires February 23, 1988. Plaintiff is thereby attempting to use its method patent to extend the monopoly of its apparatus patent. Plaintiff makes no charge for a license under the method patent in suit when its hair curling devices are sold, thereby granting the users an implied license under the

patent in suit. Plaintiff thus discriminates between purchasers of Plaintiff's hair curling devices who receive this implied license and purchasers of Defendants' devices whom Plaintiff refuses to license.

60. Any finding of fact entered herein which may be construed in whole or in part as a conclusion of law shall be deemed and treated as if set forth under Conclusions of Law herein.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter of these consolidated actions. Venue is properly laid in this District.

2. Plaintiff is the owner of United States Letters Patent No. 3,565,083, the patent in suit, and has the right to sue for infringement.

3. The presumption of validity arising from the grant of a patent does not exist as against prior art not considered by the Patent Office. Pertinent prior art in evidence before this Court was not before the Patent Office in the prosecution proceedings respecting United States Letters Patent No. 3,565,083, and other pertinent art was not properly considered by the Examiner due to misrepresentations made by the patentee. T. P. Laboratories, Inc. v. Huge, 371 F. 2d 231, 234 (7th Cir. 1966); Amerline Corp., et al. v. Cosmo Plastics Co., 271 F.Supp. 215 (N.D.Ill.1967), aff'd 407 F. 2d 666 (7th Cir. 1969).

4. The Japanese instruction book (DX 1) and the Japanese advertising pamphlet (DX 2) relating to the Matsushita Model EH–801 Hot Curler with Steamer, are each prior printed publications within the meaning of 35 U.S.C. § 102.

5. The method claim of United States Letters Patent No. 3,565,083 is invalid because it is anticipated under 35 U.S.C. § 102 in all material respects by the prior art and any differences are minor matters that would suggest themselves to one of ordinary skill in the art.

Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227 (7th Cir. 1969).

6. The guidelines for the application of the patentability test of 35 U.S.C. § 103 were set forth by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) as follows:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

7. The method claim of United States Letters Patent No. 3,565,083 is invalid because the differences between the subject matter patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the alleged invention to one having ordinary skill in the art. Graham v. John Deere Co., *supra*.

8. Contemporaneous developments by third parties working in the hair curler field (Matsushita Electric Works Ltd. and Hankscraft Company) are persuasive evidence that the subject matter of the claim of the patent in suit was obvious within the meaning of 35 U.S.C. § 103. Felburn v. New York Central Railroad Company, 350 F.2d 416, 425 (6th Cir. 1965); Amerline Corp. et al. v. Cosmo Plastics Co., *supra*.

9. Commercial success is at best a secondary test for obviousness and must be directly attributable to the invention set forth in the claim of the patent in suit rather than to extraneous factors such as Plaintiff's extensive advertising. Commercial success is not a substitute for patentable invention where, as here, invention is plainly lacking. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., et al., 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950).

■ 10. Defendants have the burden of proof on the issue of invalidity, which burden they have sustained, and the sole claim of the patent in suit is invalid.

■ 11. The claim of the patent measures the grant. It must, in this instance, define the patentee's method with sufficient certainty that one skilled in the art can determine whether or not any particular sequence of steps does or does not fall within its metes and bounds, as well as what feature or features must be altered or omitted if the claim is not to be infringed.

■ 12. Plaintiff acquiesced in the rejections of broader claims during the prosecution of the applications for the patent in suit. Numerous interviews with the patent examiners were held, and limitations were introduced to distinguish over the prior art. The claims were allowed on that basis. These limitations must be considered in determining whether there is any infringement, and when claims for an invention have been abandoned, cancelled or surrendered, they may not be reasserted by the patentee. Graham v. John Deere Co., *supra.*

■ 13. The Plaintiff is bound by each of the limitations inserted in its claim in order to obtain a patent and and may not deny their materiality to make the claim read on Defendants' activities. Keating v. Stearnes Imperial Co., 347 F.2d 444 (7th Cir. 1965).

■ 14. None of the accused hair curling devices, when operated pursuant to the respective manufacturers' instructions, would cause the user to infringe the claim of United States Letters Patent No. 3,565,083 and, in any event, Plaintiff has offered no proof of direct infringement.

15. Following the respective manufacturers' instructions for operating the accused devices would not induce infringement of the patent in suit.

16. Defendants have neither infringed nor induced infringement of the patent in suit.

■ 17. Plaintiff has the burden of proof on the issue of infringement and it has failed to sustain that burden as to either direct infringement or inducement of infringement.

Therefore, the complaints in Civil Actions Nos. 70 C 295, 71 C 591, 71 C 979 and 71 C 1352 are wanting in equity and are dismissed.