The **VOLLRATH CO.,** Plaintiff,

v.

**PREMIUM PLASTICS, INC.,**
Defendant.

No. 72 C 2498.

United States District Court,
N. D. Illinois.

Sept. 3, 1974.

Arthur L. Morsell, Wheeler, Morsell and House & Fuller, Milwaukee, Wis., for plaintiff.

R. Howard Goldsmith and Gerson E. Meyers, Dressler, Goldsmith, Clement & Gordon, Ltd., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BAUER, District Judge

### A. FINDINGS OF FACT

These findings of fact result from a careful consideration of the testimony by the respective witnesses at trial, the documentary and physical exhibits submitted by the parties in support of their respective positions, and other competent evidence submitted by the parties. These findings are predicated upon the Court's observation of the witnesses and its consideration of their demeanor and credibility.

### The Parties and Jurisdiction

1. Plaintiff, The Vollrath Co., is a Wisconsin corporation having its principal place of business at Sheboygan, Wisconsin. Plaintiff is the owner by Assignment of each of the patents in suit.

2. Defendant, Premium Plastics, Inc., is an Illinois corporation having its principal place of business at Chicago, Illinois, where it has manufactured bedpans charged to infringe plaintiff's patents.

3. This is an action for the alleged infringement of U.S. Patent No. 3,597,771 ("the product patent") for a bedpan which issued in the name of Carl H. Rickmeier, Jr. on August 10, 1971 on an application filed July 9, 1969 and U. S. Design Patent No. Des. 216,059 ("the design patent") for a bedpan which issued in the name of Carl H. Rickmeier, Jr. on November 18, 1969 on an application filed February 12, 1969.

4. This Court has jurisdiction of the subject matter of the suit and of the parties.

5. Each of the patents in suit has a single claim. Plaintiff, in its Complaint, has charged defendant with infringement of both the product patent and the design patent. Defendant, in its answer and counterclaim, has asserted invalidity and denied infringement of each of the patents.

### The Prior Art

6. Bedpans have long been on the market. The traditional bedpan of conventional configuration is the stainless steel bedpan (DX 1–E) and the blow molded plastic counterparts of similar shape and configuration illustrated by DX 1–C and DX 1–G, the latter being referred to as the "Medical Blue" bedpan during the course of the trial. These bedpans have a conventional seat portion extending inwardly from the fluid retaining wall; the seat portion is undercut to prevent splashing.

7. Prior to plaintiff's activities culminating in the patents in suit, defendant Premium marketed a low cost, single patient use, injection molded plastic bedpan, DX 1–A ("original Premium injection molded pan"). DX 1–A was the subject of a design patent (DX 12) issued in the name of Painter and Crab-

tree ("Painter et al.") and assigned to defendant Premium. DX 1–A has no undercut portion; the seat consists of an outwardly extending flange extending around the sides and back of the pan. DX 1–A has a horizontal flange or lip at the front and a downwardly extending flange around its periphery. The original Premium injection molded pans nest inside one another. The original Premium injection molded bedpans taught the art the desirability of a low cost, single patient use, disposable injection molded bedpan.

8. Two bedpans known as "fracture pans" were introduced in evidence (DX 2 and DX 13). DX 2 is a pan manufactured for and sold by defendant Premium some seven or eight years (Tr. 217) and is an injection molded bedpan having a flange around its outer periphery and an undercut at the back. Plaintiff has sold a pan like DX 2 for more than a year prior to plaintiff's patented pan (Tr. 83; PX 13, PX 14 and PX 15). DX 2 "semi-stacks" in the same manner as plaintiff's patented bedpans. DX 13 is a multiple purpose injection molded pan which has been marketed for about ten years (Tr. 221–2); it also has a seating flange about its periphery and an undercut at the rear. The fracture pans taught the art that bedpans incorporating an undercut could be produced by injection molding.

9. The other item of prior art relied upon by defendant is a British patent to Parker, No. 992,493, and forming a part of DX 8. The bedpan of the Parker patent is a disposable nestable bedpan having a stabilizing flange extending downwardly to its bottom and around its periphery.

10. The Parker and Painter et al. patents were cited by the Patent Office during the prosecution of the product patent, but the stainless steel, Medical Blue and fracture pans were neither cited by the Patent Office nor called to the attention of the Patent Office by plaintiff (Tr. 261). The Parker and Painter et al. patents and the stainless steel, Medical Blue and fracture pans were neither cited by the Patent Office nor called to the attention of the Patent Office by plaintiff in connection with the prosecution of the design patent (Tr. 261).

## The "Development" Resulting In Plaintiff's Patents

11. Defendant's original injection molded bedpan was introduced at a Hospital Show in August 1968 (Tr. 220–1). It was observed with interest by Mr. Carl Rickmeier, plaintiff's then Director of Marketing (Tr. 222), and by Mr. Richard Ertel, plaintiff's Purchasing Agent; Mr. Ertel testified, "I was quite amazed because it was the first injection molded bedpan I ever saw." (DX 15–A, p. 5).

12. Mr. Rickmeier discussed the original Premium injection molded pan with his customers in the industry (Tr. 222–3), people having ordinary skill in the art. Mr. Rickmeier ascertained that it was the consensus of opinion of his customers that the original Premium injection molded pan could be improved upon because (1) it did not look enough like the conventional bedpans such as the stainless steel or Medical Blue bedpans, (2) it looked unstable, and (3) it had no undercut to prevent splashing (Tr. 222–3).

13. Mr. Rickmeier discussed the advisability of making an injection molded bedpan with others at The Vollrath Company, including Mr. Robert Moran, Vollrath's design draftsman (Tr. 224). Mr. Rickmeier told Mr. Moran to make a design drawing of an injection molded bedpan that incorporated those features his customers had recommended be incorporated in the original Premium injection molded pan, DX 1–A, namely, an injection molded bedpan that (1) looked like the conventional molded bedpan, (2) that had stabilizing wings, and (3) that had an undercut (Tr. 224).

14. As a result of his discussion with Mr. Rickmeier, Mr. Moran made drawings which show plaintiff's bedpan (DX 5 and DX 6); these drawings were the basis for both the design patent and the

product patent and were made to look like the conventional Medical Blue and stainless steel bedpans (DX 15–A, p. 16).

15. Mr. Rickmeier did not give Mr. Moran instructions regarding the appearance of the bedpan other than to make it look conventional and have stabilizing wings and an undercut; Mr. Rickmeier left the shapes and curves to the design draftsman, Mr. Moran (Tr. 228).

16. Mr. Henry Ruppel, Vollrath's model maker, constructed a model in accordance with Mr. Moran's drawing (DX 3); the seat portion of the model and the downwardly extending wings were simply cut from a blow molded bedpan like the Medical Blue bedpan (DX 15–C, pp. 4–6). The fluid retaining walls of necessity followed the contour of the seat with a slight slant to permit removal from the mold in the plastic molding operation (DX 15–C, p. 8, Tr. 246).

*The Prosecution of the Product Patent In Suit*

17. Mr. Rickmeier requested Mr. James Stephani, Vollrath's patent liaison man, to arrange to "do what he thought was necessary to obtain a patent" (Tr. 228–9). From that point on, Mr. Stephani handled the matter of the patent prosecution with Vollrath's attorneys (Tr. 229). Mr. Rickmeier had nothing to do with the prosecution of either the product patent application or the design patent application and had no discussions with Vollrath's attorneys concerning the prosecution of either of plaintiff's patent applications (Tr. 229).

18. The product patent application filed on July 9, 1969, contains a "Summary Of The Invention" stating the "objects" of the alleged invention; this is the same "Summary Of The Invention" contained in the patent as issued (see File History, DX 7). Each and every object stated in the Summary Of The Invention is contained in the prior art (Tr. 168–75).

19. The product patent application as originally filed contained eight original claims which read as follows:

"1. A one-piece molded plastic bed pan comprising: a substantially oval, open-top pan having a rearward end and a forward end, said pan including a side wall and a flat bottom formed integrally with said side wall; and a flange formed on the top of said side wall extending substantially around the periphery of said pan, said flange including a flat horizontal portion extending laterally outwardly and a substantially right-angularly and downwardly deflected, generally vertical outer flange portion spaced from said pan side wall.

"2. The bed pan recited in Claim 1 and wherein said downwardly-deflected flange portion is provided with a bottom longitudinal edge which is designed to engage the surface of the mattress when a patient is seated thereon to provide stability and prevent said pan from tipping.

"3. The bed pan recited in Claim 2 and wherein said flange bottom longitudinal edge is spaced above the plane of said pan bottom.

"4. The bed pan recited in Claim 3 and wherein said downwardly-deflected flange portion is formed in a manner permitting an attendant to insert his fingers under said flange bottom edge to facilitate the withdrawal of said pan from beneath a patient.

"5. The bed pan recited in Claim 1 wherein said flange top portion extends around the rear of said pan to provide an undercut area therebelow preventing splashback.

"6. The bed pan recited in Claim 1 wherein said side wall is tapered downwardly and inwardly to provide a draw permitting the injection molding of said plastic bed pan.

"7. The bed pan recited in Claim 6 wherein said bed pan is tapered from front to rear, and wherein a plurality of said pans can be stacked in nesting relation.

"8. The bed pan recited in Claim 1 wherein said pan is molded of relatively thin gauge plastic material and wherein said right-angular flange enhances the strength and rigidity of said pan" (DX 7, pp. 12–13).

20. On June 18, 1970, the Examiner issued an Official Action rejecting original Claims 1 through 8 as being unpatentable over the British Parker patent, in view of a patent to Saulson. The Examiner pointed out that Parker shows a nestable disposable bedpan having a downturned flange for stability (the length of which is simply a matter of design), and that Saulson showed the undercut to prevent splashing (DX 7, p. 19).

21. On August 31, 1970, plaintiff's counsel responded to the Official Action (DX 7, pp. 21–25). Original Claims 1–8 were all cancelled with the statement (DX 7, p. 23):

"... it is conceded that the Parker devide anticipated the structure recited in said original claims."

22. In the response of August 31, 1970, plaintiff added a new claim, claim 9, which became the claim of the patent after some further amendments. In conjunction with new Claim 9, it was asserted (DX 7, pp. 22–23):

"More specifically, new claim 9 recites an entirely new and unique bed pan design where the pán is tapered rearwardly, in its vertical dimension, and wherein the forward portion of the pan is devoid of the peripheral flange which extends around the major portion of the pan, with the result that a plurality of said pans can be stacked in semi-nesting condition, with the forward end of each pan partially inserted into the pan therebelow and with the upper pan rearward end resting on the horizontal top flange portion at the rear of the lower pan."

It was also asserted, with regard to other references that had been cited (DX 7, pp. 24):

"In addition neither of said references is nestable which is a critical feature of the present invention and which is recited in detail in new claim 9."

23. The Patent Office then responded with a further Official Action rejecting a new Claim 9 as being unpatentable in view of the Painter, et al. patent for the original Premium injection molded bedpan. The Examiner also stated that new Claim 9

"... is misdescriptive of what is shown in the drawing and disclosed in the specification. Lines 7–13 recite flange structure which appears to differ from what is shown in the drawing" (DX 7, p. 27).

24. On December 3, 1970, a further response was filed by plaintiff's counsel, which stated (DX 7, p. 30):

"Another important structural feature of the present invention which is not disclosed in the Painter reference patent is that due to the fact that the forwardmost portion of the applicant's novel pan is devoid of the peripheral flange (unlike the Painter bed pan), with applicant's unit a plurality of said bed pans can be stacked in semi-nesting condition, 'with the forward end of each pan partially inserted into the pan therebelow and with the upper pan rearward end resting on the horizontal top flange portion at the rear of the lower pan.' Such a stacking arrangement is not even vaguely suggested in the Painter reference."

25. At the trial it was demonstrated that the stackability of the plaintiff's pans is in no way influenced by the presence or absence of the flange at the front (Tr. 194). It was also demonstrated at the trial that Premium's original injection molded pans corresponding to the Painter et al. patent nest or stack inside of one another and that the original Premium injection molded pan has a horizontal flange at the front (Tr. 165).

26. After plaintiff's response of December 3, 1970, there was a telephone conference between the Examiner and plaintiff's counsel, Claim 9 was issued, and then allowed (DX 7, pp. 33–4).

This last amendment to the claim was in response to the Examiner's statement in the preceding action to the effect that the claim was misdescriptive in citing flange structure which differed from that shown in the drawing (Tr. 261–2, see Finding 23, above). This is a customary type of amendment made to clarify language and place an application in condition for allowance (Tr. 270–1).

27. The claim of the patent as issued contains no new or unique feature over and above those set forth in the original eight claims which were cancelled with the concession that the Parker device anticipated the structure in the original eight claims (Tr. 154, 251–2).

28. The only difference between the claims of the patent as issued and the original eight claims which were cancelled as being anticipated is the following language appearing in the claim as issued (Tr. 251–2, 271):

" . . . said flange commencing at a point spaced rearwardly from the pan forward end and extending around the periphery of the pan to a point on the opposite side of said pan spaced equallydistant from said pan forward end whereby the pan forward end portion is devoid of said horizontal extending flange member;

\* \* \* \* \* \*

" . . . the tapered contour of said pan side wall together with the design of the pan forward portion which is devoid of said horizontal flange permitting a plurality of said pans to be stacked one upon another in a manner whereby the forward end portion of a pan is inserted partially into the forward end portion of the pan therebelow and with the rearward portion of the upper pan biased upwardly and resting on the flat flange portion at the rear of said lower pan, the said rearwardly tapered vertical dimension of said pans providing a substantially flat, horizontal top surface when pans are in said stacked condition."

29. The claim language quoted in Finding 28 is misleading because the presence or absence of the flange at the front has nothing to do with the alleged critical stackability feature and for the further reason that plaintiff failed to advise the Patent Office that the Medical Blue and stainless steel pans were similarly devoid of a horizontal flange. Premium's original injection molded pan and the Parker pan are each nestable and stackable pans.

*The Subject Matter of the Claim of Plaintiff's Product Patent No. 3,-597,771 Is Obvious In View of the Prior Art.*

■ 30. Every feature in the single claim of Plaintiff's product patent is found in the prior art (Tr. 195–6).

31. Plaintiff's witnesses were unable to set forth any significant structural features in plaintiff's product patent other than (1) the undercut to prevent splashing and (2) the stabilizing wings (Tr. 52, 58–9, 80–1). The undercut feature is contained in the stainless steel and Medical Blue pans and in the fracture pans (Tr. 143–4). The stabilizing wings are contained in the Parker patent (Tr. 129–130), and there are similar downturned flanges in Premium's original injection molded bedpan; the length of the stabilizing wings is merely a matter of choice or design and does not represent invention in the structure (DX 7, p. 19).

32. There is nothing unobvious in omitting a horizontal flange from the front of the bedpan; the absence of a horizontal flange is the only structural difference between the patent claim as issued and the original eight claims that were cancelled (Tr. 251–2) with the admission that the original eight claims were all anticipated by the Parker patent (DX 7, p. 23). The stabilizing wings are recited in cancelled original Claims 1–4, inclusive (DX 7, p. 12) and the undercut is recited in cancelled original Claim 5 (DX 7, p. 13).

33. It would be obvious to one skilled in the art to which the subject matter pertains, namely, the plastic molding

art, to provide an undercut in the original Premium plastic injection molded pan DX 1–A such as that in the prior Medical Blue, stainless and fracture pans, and it would also be obvious to one skilled in the art in view of Parker to increase the length of the downturned flanges in DX 1–A to provide more stability.

34. It would be obvious to one skilled in the art to which the subject matter pertains, namely, the plastic molding art, to provide an undercut in the Parker pan such as the undercut in either the Medical Blue or stainless steel bedpans or the fracture bedpans. Parker also has a structure equivalent to the undercut in his folded cover (Tr. 269–70).

35. The undercut has the same structure and function in plaintiff's patented bedpan as it does in the prior art stainless steel and Medical Blue bedpans and in the fracture bedpans; the stabilizing wings in plaintiff's patented bedpan have the same structure and function as those of the Parker bedpan (Tr. 263).

36. The combination of the undercut and the stabilizing wings and the structure contained in the claim of plaintiff's patent produces no different force, effect or result and involves no change in the respective functions of each of these elements from those in the prior art (Tr. 263).

37. The differences between the subject matter contained in the claim of plaintiff's product patent and in any item of the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the plastic molding art.

38. The Findings 32–37 above as to obviousness are not affected by the commercial success of plaintiff's patented bedpan (Tr. 48–9). There is no evidence in the record to explain such commercial success other than that the patented bedpan sells for about one-eighth the price of blow molded bedpans (Tr. 59). Defendant sells about the same number of its original injection molded bedpans as it does the bedpans charged to infringe (Tr. 207).

*Plaintiff's Product Patent No. 3,597,771 Is Not Infringed*

39. The limitation in the claim of the product patent as issued, namely that the forward end portion of the pan is devoid of a horizontal flange whereby a plurality of pans can be stacked in one another, is a critical limitation (Tr. 251–2, 259), and is the only feature that distinguishes the claim as issued from the original eight claims that were cancelled as being anticipated (Tr. 271–2).

40. In designing its accused bedpan, defendant's President instructed the moldmaker to retain the rim or lip on the front of the pan similar to that in the original Premium injection molded bedpan, DX 1–A (Tr. 208). The rim or lip strengthens the front of the pan, allowing for the use of less material, and it makes for ease in pouring to empty the pan (Tr. 209). The rim or lip is a horizontal flange (Tr. 120–1) and, from the standpoint of function, it is immaterial whether the flange is smaller in the accused pan (DX 1–B than in the original Premium injection molded pan (DX 1–A) (Tr. 218).

41. Defendant's accused pan does not infringe the claim of the product patent because it is not devoid of a horizontal flange at the front as required by the claim (Tr. 259).

42. Defendant's accused bedpan does not infringe the product patent claim because the claim is invalid and an invalid patent cannot be infringed.

*Plaintiff's Design Patent No. Des. 216,-059 Is Neither Valid Nor Infringed*

43. One of the prime purposes in creating plaintiff's new bedpan was to give it the same aesthetic appearance as that of the conventional stainless steel bedpan or Medical Blue bedpan and plaintiff's witnesses so agreed (Tr. 62–3, 80). During the three days of trial, the Court had the opportunity to observe with great care all of the bedpans here involved and finds that all of the respective bedpans are generally similar in ap-

850

pearance, including the plaintiff's patented bedpan and those of the prior art (DX 1–D, DX 1–E, DX 1–F, DX 1–G, DX 1–H).

44. Such differences as there are in appearance between plaintiff's design patented bedpan and the bedpans of the prior art are dictated by mechanical or functional requirements of their structure. In order to injection mold a bedpan, it is necessary that the fluid retaining walls follow the contour of the seat portion and cant downwardly and inwardly to form a draw so that it can be removed from mold (Tr. 246). In an injection molded bedpan the walls extend downwardly from the innermost portion of the seat, thereby reducing the amount of bottom surface so that the addition of stabilizing wings in the form of downturned flanges functions to stabilize the pan. In order to have an anti-splash feature, it is necessary to provide an undercut portion. The appearance is thus the result of mechanical or functional requirements in order to accomplish the desired features above mentioned. Plaintiff advertises its bedpan as a "new functional design" (PX 15, PX 17, Tr. 63–4).

45. The Court finds that the differences between the subject matter set forth in plaintiff's patent No. Des. 216,-059 and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the plastic molding art.

46. The Court finds that the design of plaintiff's patent No. Des. 216,059 is not new, original and ornamental and neither displays creative originality in artistry nor an exercise of any inventive faculty in design. Rather, the design shown in plaintiff's patent is within the skill of an ordinary designer.

47. From a technical perspective, the profile of the accused design is lower than that of plaintiff's patent, the sides in the accused design are more concave than those of plaintiff's design patent. The accused design also has a flange at the front not found in plaintiff's patent. Plaintiff's patent No. Des. 216,059 is

not infringed because the designs are not the same and because an invalid patent cannot be infringed.

## B. CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action.

2. The presumption of validity arising from the grant of a patent does not exist as against relevant prior art not considered by the Patent Office. Appleton Electric Co. v. Efengee Electrical Supply Co., 412 F.2d 579, 581 (7th Cir. 1969); Novo Industrial Corp. v. Standard Screw Co., 374 F.2d 824, 827 (7th Cir. 1967); T. P. Laboratories, Inc. v. Huge, 371 F.2d 231, 234 (7th Cir. 1966); Popeil Bros., Inc. v. Schick Electric, Inc., 356 F.Supp. 240, 251 (N. D.Ill.1972), aff'd 494 F.2d 162 (7th Cir. 1974).

3. The presumption of validity is weakened or destroyed because of untrue statements and material misrepresentations made during the prosecution of the patent application before the Patent Office. Shelco, Inc. v. Dow Chemical Co., 322 F.Supp. 485, 517 (N.D.Ill. 1970), aff'd 466 F.2d 613 (7th Cir. 1972).

4. The purported invention here is anticipated by the prior art because plaintiff's product is essentially the same as the prior art and any difference is such as would suggest itself to one of ordinary skill in the art. Popeil Bros. Inc. v. Schick Electric, Inc., 494 F.2d 162, 166–167 (7th Cir. 1974); Shelco, Inc. v. Dow Chemical Co., supra, 466 F. 2d at 614–615; Deep Welding Inc. v. Sciaky Bros. Inc., 417 F.2d 1227, 1234 (7th Cir. 1969); Amphenol Corp. v. General Time Corp., 397 F.2d 431, 438 (7th Cir. 1968).

5. It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent. By cancelling the eight original claims in

the product patent application as filed, plaintiff disclaimed the subject matter of those claims and has failed to distinguish the remaining claim of the patent as issued from the subject matter of the original cancelled claims. Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965); Schriber-Schroth v. Cleveland Trust Co., 311 U.S. 211, 220–221, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Popeil Bros. Inc. v. Schick Electric, Inc., *supra.*

6. Each of the elements contained in the patented bedpan is found in the prior art and functions in exactly the same manner that it functioned in the prior art; there is no new result produced by the aggregation of elements into the patented bedpan and hence the product patent is invalid. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 61, 90 S.Ct. 305, 24 L. Ed.2d 258 (1969); Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152–153, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L. Ed. 719 (1876).

7. The instant patents are invalid because the difference between the subject matter patent and the prior art are obvious to one having ordinary skills in the art to which the subject matter pertains. 35 U.S.C. § 103; Graham v. John Deere Co., *supra,* 383 U.S. at 37, 86 S. Ct. 684.

■ 8. When the solution to a problem is apparent in view of the prior art, it is of no moment to assert long felt need and the failure of the art to arrive at a solution absent proof that those skilled in the art had been unable to solve the problem. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330–331, 65 S.Ct. 647, 89 L.Ed. 973 (1944).

■ 9. When a structure is obvious in view of the prior art, secondary considerations such as commercial success and long felt need cannot tip the scales in favor of patentability. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Graham v. John Deere Co., *supra,* 383 U.S. at 61, 86 S. Ct. 684; Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., *supra.* Commercial success is irrelevant to the question of validity unless it is proved that it is directly attributable to the claimed invention rather than to extraneous factors such as, in this case, the relatively low price of the patented product when compared to the prior art. Popeil Bros. Inc. v. Schick Electric, Inc., *supra,* 356 F.Supp. at 251; Shelco, Inc. v. Dow Chemical Co., *supra.*

■ 10. The design patent is invalid because it is not new, original and ornamental. A design to be patentable must be inventive, must exhibit creative originality in artistry and must be beyond the skill of an ordinary designer. Amerock Corp. v. Aubrey Hardware Manufacturing, Inc., 275 F.2d 346, 348–349 (7th Cir. 1960); Hopkins v. Waco Products, Inc., 205 F.2d 221, 223 (7th Cir. 1953); Hueter v. Compco Corp., 179 F.2d 416 (7th Cir. 1950); Bentley v. Sunset House Distributing Corp., 359 F.2d 140, 145–161 (9th Cir. 1966).

11. The design patent is invalid because its appearance is dictated by mechanical or functional requirements of the structure. Hopkins v. Waco Products, Inc., *supra;* Hueter v. Compco Corp., *supra;* Lewis E. Hamel Co. v. P & K Inc., 185 F.Supp. 278, 282 (E.D.Ill. 1960); Barofsky v. General Electric Corp., 396 F.2d 340, 343–344 (9th Cir. 1968).

12. There is no infringement because defendant's structure omits an element set forth in the claim of the product patent. North Star Ice Equipment Co. v. Akshun Mfg. Co., 301 F.2d 882, 886 (7th Cir. 1962); Edwards v. Hychex Products, 171 F.2d 259, 260 (7th Cir. 1948); All States Plastic Mfg. Co. v. Weckesser Co., Inc., 362 F.Supp. 94, 99–100 (N.D.Ill.1973).

13. In order to distinguish the product patent claim from previous claims in the application that had been cancelled, plaintiff added language stating that the forward end of its bedpan was "devoid of a horizontal flange". This is a critical limitation that cannot be ignored,

and defendant's structure does not infringe because it is not devoid of a horizontal flange. Graham v. John Deere Co., *supra*; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Popeil Bros., Inc. v. Schick Electric, Inc., *supra*.

14. The defendant has the burden of proof on the issue on invalidity, which burden they have sustained and an invalid patent cannot be infringed. Popeil Bros., Inc. v. Schick Electric, Inc., *supra*, 356 F.Supp. at 252.

15. The plaintiff's product patent No. 3,597,771 is invalid, and not infringed by the defendant. The plaintiff's design patent No. Des. 216,059 is invalid and not infringed by defendant.

Therefore, it is hereby ordered that the instant complaint is dismissed and the defendant's counterclaims for declaratory judgment of the invalidity of the relevant patents and noninfringement are sustained.